UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                                   )
UNITED STATES OF AMERICA          )          CR. NO. 05-CR-10010
                                                                   )
                                                                   )
V.                                                                )
                                                                   )
                                                                   )
JOHN MONTONI, ET AL.,                     )
_____)

**<u>SENTENCING MEMORANDUM ON BEHALF OF JOHN MONTONI</u>**

Through counsel, John Montoni ("Montoni") files the following Sentencing

Memorandum setting forth all factors that the Court should consider in determining what

type and length of sentence is sufficient, but not greater than necessary, to comply with

the statutory directives set forth in 18 U.S.C. § 3553(a).

On September 26, 2006, Montoni entered a plea of guilty to Count 42 of the

indictment that charged him with conspiracy to commit mail, wire and health care fraud,

in violation of 18 U.S.C. sec. 371. At that time, the U.S. Attorney agreed to dismiss

Montoni from the remaining counts of the indictment at the time of sentencing.

Additionally, the U.S. Attorney agreed that in the event Montoni provided substantial

assistance in the investigation or prosecution of another person who has committed a

criminal offense then, at or before the time of sentencing, he would file a motion under

5K1.1 of the U.S.S.G. so that the sentencing court may impose a sentence below that

which otherwise would be required under the relevant statutes. At this time, Montoni

anticipates that the relevant motion will be filed by the U.S. Attorney.

Finally, through his medical history, we have come to learn that many of the

actions connected to the instant offense are deeply rooted in Montoni's clinical diagnosis

of major depression with psychotic features. The condition was diagnosed in January of

1997, and predate the events as set forth in the indictment. As a result of this illness, we

believe that Montoni's ability and capacity to act in a manner other than he did was

diminished. Pursuant to 5K2.13, this diminished capacity would serve as an additional

ground for departure from the U.S.S.G. as the facts of the case are clear that that the

offense was nonviolent, Montoni suffered from significantly reduced mental capacity not

resulting from the voluntary use of drugs or other intoxicants and his criminal history

does not indicate a need for incarceration to protect the public. For a complete analysis of

Montoni's mental condition at the time of the offense and a clinical application to the

facts at bar we refer the Court to the report of Dr. Robert Joss ("*Joss report*"), attached

hereto in its entirety.

### **Sentencing under *Booker***

On January 12, 2005, the Supreme Court ruled that its Sixth Amendment holding

in Blakely v. Washington, 124 S. Ct. 2531 (2004) and Apprendi v. New Jersey, 530 U.S.

466 (2000) applies to the Federal Sentencing Guidelines. United States v. Booker, 125 S.

Ct. 738, 756 (2005). Given the mandatory nature of the Sentencing Guidelines, the Court

found "no relevant distinction between the sentence imposed pursuant to the Washington

statutes in Blakely and the sentences imposed pursuant to the Federal Sentencing

Guidelines" in the cases before the Court. Id. at 751. Accordingly, reaffirming its holding

in Apprendi, the Court concluded that

> [a]ny fact (other than a prior conviction) which is necessary to support a
> sentence exceeding the maximum authorized by the facts established by a
> plea of guilty or a jury verdict must be admitted by the defendant or
> proved to a jury beyond a reasonable doubt. Id. at 756.

Based on this conclusion, the Court further found those provisions of the

federal Sentencing Reform Act of 1984 that make the Guidelines mandatory, 18

U.S.C. § 3553(b)(1) or which rely upon the Guideline's mandatory nature, 18

U.S.C. § 3742(e), incompatible with its Sixth Amendment holding.  Booker, 125 S. Ct. at

756. Accordingly, the Court severed and excised those provisions, "mak[ing] the

Guidelines effectively advisory." Id. at 757.

Instead of being bound by the Sentencing Guidelines, the Sentencing

Reform Act, as revised by Booker, requires a sentencing court to consider

Guidelines ranges, see 18 U.S.C.A. § 3553(a)(4) (Supp.2004), but it permits the

court to tailor the sentence in light of other statutory concerns as well, see §

3553(a). Booker, 125 S. Ct. at 757. Thus, under Booker, sentencing courts must

treat the guidelines as just one of a number of sentencing factors set forth in 18

U.S.C. § 3553(a).

The primary directive in Section 3553(a) is for sentencing courts to "impose

a sentence sufficient, but not greater than necessary, to comply with the purposes

set forth in paragraph 2." Section 3553(a)(2) states that such purposes are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to
        provide just punishment for the offense;
(B)     to afford adequate deterrence to criminal conduct;
(C)     to protect the public from further crimes of the defendant; and
(D)     to provide the defendant with needed educational or vocational training, medical
care, or other correctional treatment in the most effective manner.

In determining the minimally sufficient sentence, § 3553(a) further directs

sentencing courts to consider the following factors:

1) "the nature and circumstances of the offense and the history and
characteristics of the defendant" (§ 3553(a)(1);
2) "the kinds of sentences available" (§ 3553(a)(3);
3) "the need to avoid unwarranted sentence disparities among defendants
with similar records who have been found guilty of similar conduct" (§
3553(a)(6); and
4) "the need to provide restitution to any victims of the offense."  (§
3553(a)(7).

Other statutory sections also give the district court direction in sentencing.

Under 18 U.S.C. § 3582, imposition of a term of imprisonment is subject to the following

limitation: in determining whether and to what extent imprisonment is appropriate based

on the Section 3553(a) factors, the judge is required to "recogniz[e] that imprisonment is

4

*not* an appropriate means of promoting correction and rehabilitation" (emphasis added).

Under 18 U.S.C. § 3661, "*no limitation* shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence" (emphasis added). This statutory language certainly overrides the (now-advisory) policy statements in Part H of the sentencing guidelines, which list as "not ordinarily relevant" to sentencing a variety of factors such as the defendant's age, educational and vocational skills, mental and emotional conditions, drug or alcohol dependence, and lack of guidance as a youth. *See* U.S.S.G. § 5H1. See also United States v. Nellum, 2005 WL 300073, 2005 U.S. Dist. LEXIS 1568 (N.D. Ind. Feb. 3, 2005) (Simon, J.) (taking into account fact that defendant, who was 57 at sentencing, would upon his release from prison have a very low likelihood of recidivism since recidivism reduces with age; citing Report of the U.S. Sentencing Commission, Measuring Recidivism: the Criminal History Computation of the Federal Sentencing Guidelines, May 2004); United States v. Naylor, 359 F. Supp. 2d 521 (W.D. Va. 2005) (concluding that sentence below career offender guideline range was reasonable in part because of defendant's youth when he committed his predicate offenses – he was 17 – and noting that in Roper v. Simmons, 125 S. Ct. 1183, 1194-96 (2005), the Supreme Court found significant differences in moral responsibility for crime between adults and juveniles).

The directives of Booker and § 3553(a) make clear that courts may no longer uncritically apply the guidelines. Such an approach would be "inconsistent with the holdings of the merits majority in Booker, rejecting mandatory guideline sentences based

on judicial fact-finding, and the remedial majority in <u>Booker</u>, directing courts to consider all of the § 3353(a) factors, many of which the guidelines either reject or ignore." <u>United States v. Ranum</u>, 353 F. Supp. 2d 984, 985-86 (E.D. Wisc. Jan. 19, 2005) (Adelman, J.). As another district court judge has correctly observed, any approach which automatically gives "heavy" weight to the guideline range "comes perilously close to the mandatory regime found to be constitutionally infirm in Booker." <u>United States v. Jaber</u>, 362 F. Supp. 2d 365 (D. Mass. 2005). See also <u>United States v. Ameline</u>, 400 F.3d 646, 655-56 (9th Cir. Feb. 9, 2005) (advisory guideline range is "only one of many factors that a sentencing judge must consider in determining an appropriate individualized sentence"), reh'g en banc granted, 401 F.3d 1007 (9th Cir. 2005).

Justice Scalia explains the point well in his dissent from Booker's remedial holding:

> Thus, logic compels the conclusion that the sentencing judge, after considering the recited factors (including the guidelines), has full discretion, as full as what he possessed before the Act was passed, to sentence anywhere within the statutory range. If the majority thought otherwise – if it thought the Guidelines not only had to be 'considered' (as the amputated statute requires) but had generally to be followed – its opinion would surely say so. <u>Booker</u>, 125 S. Ct. at 791 (Scalia, J., dissenting in part).

Likewise, if the remedial majority thought the guidelines had to be given "heavy weight," its opinion would have said so. The remedial majority clearly understood that giving any special weight to the guideline range relative to the other Section 3553(a) factors would violate the Sixth Amendment.

In sum, in every case, a sentencing court must now consider <u>all</u> of the § 3353(a)

factors, not just the guidelines, in determining a sentence that is sufficient but not greater than necessary to meet the goals of sentencing.  And where the guidelines conflict with other sentencing factors set forth in § 3553(a), these statutory sentencing factors should generally trump the guidelines.  See United States v. Denardi, 892 F.2d 269, 276-77 (3d Cir. 1989) (Becker, J, concurring in part, dissenting in part) (arguing that since § 3553(a) requires sentence be no greater than necessary to meet four purposes of sentencing, imposition of sentence greater than necessary to meet those purposes violates statute and is reversible, even if within guideline range).

## APPLICATION OF THE STATUTORY SENTENCING FACTORS TO THE FACTS OF THIS CASE

In the present case, the following factors must be considered when determining what type and length of sentence is sufficient, but not greater than necessary, to satisfy the purposes of sentencing:

**1.      The Nature and Circumstances of the Offense and the History and Characteristics of the Offender:**

The nature and circumstances of the instant offense are intrinsically tied to the history and characteristics of Montoni. Therefore, for the purpose of this memorandum, the two will be discussed in conjunction with one another.

Montoni was born in Chelsea MA on March 21, 1953, the second of six children. His parents divorced when he was approximately 12 years old. Following the divorce,

Montoni moved with his mother to Salem, MA. Montoni and his siblings were then fragmented. Some resided with their father, while others lived with their mother, sometimes moving back and forth.

Montoni's mother struggled with problems associated with alcohol and prescription medication. The facts suggest that at some point in time she attempted suicide. This led directly to Montoni vacating his mother's house and, at the age of 16, moving in with his grandparents for the next 5 years.

In or about 1974, Montoni graduated from North Shore Community College with an Associate's Degree in X – Ray Technology. He then enrolled at Cleveland Chiropractic College in Los Angeles, CA, graduating in 1979. Subsequent to graduation, he opened a chiropractic practice in central California. The practice did well. However, in 1984, he sold the practice to his partner and moved back to MA after the birth of his first child.

From 1985 through 2005 Montoni was a licensed chiropractor in MA. [1] However, in the early 1990's his ability to function and work on an everyday basis began to substantially diminish. He began to experience a physical downturn that was directly tied to a simultaneous emotional downturn. In or about 1997, Montoni was diagnosed with major depression with psychotic features. He was prescribed 50 milligrams of Zoloft daily and referred for psychotherapy. At the time of the 1997 evaluation he was described as "…disheveled and exhibiting prominent psychomotor retardation… He reports somatic complaints of delusional proportions..". *Joss report* p.6. It appears that he did not like the condition that Zoloft physically left him in. As a result, he discontinued the

medication. The cumulative effect of his impairment was that Montoni reduced his work schedule to approximately 11 - 14 hours per week. This reduction was all that he felt he could cope with both physically and emotionally.

It should be noted that Montoni's involvement the instant offense took place in 1999 and concluded prior to November 2000. It was during this time that Montoni's depression continued to have a substantial hold on him. Dr. Joss is of the opinion that it is entirely consistent with Montoni's presentation that he was unable to confront his codefendants and extricate himself from the situation even after he discovered what was happening and understood it to be wrong. *Joss report* p. 12.

2.    **The Kinds of Sentences Available:**

In <u>Booker</u>, the Supreme Court severed and excised 18 U.S.C. § 3553(b), the portion of the federal sentencing statute that made it mandatory for courts to sentence within a particular sentencing guidelines range. <u>Booker</u>, 125 S. Ct. at 756. Since the guidelines are now advisory, the sentencing table and restrictions on probationary sentences, sentences of home confinement and split sentences in U.S.S.G. 5A, 5B1 and 5C1 are also advisory. Likewise, supervised release is no longer mandatory, unless required by statute. The only restrictions on sentencing are those imposed by statute. Thus, unless a mandatory minimum statute applies, probation is available for all but Class A and B felonies under 18 U.S.C. 3561 (a). To receive a sentence of probation,

---

[1] Montoni voluntarily surrendered his license after the instant indictment and now works as a self employed artist and clam digger. A sampling of some of his artwork will be provided at sentencing as the ECF system does not provide an adequate tool for viewing.

Montoni does not have to come within Zones A or B on the sentencing guidelines table and to receive a split sentence of imprisonment and home or community confinement Montoni does not have to come within Zone C.

Where, as here, Montoni arguably falls within Zone D, this Court has the authority to impose a sentence that ranges anywhere from probation to home confinement, community confinement, or any combination thereof. In <u>U.S. v. Anderson</u>, 365 F. Supp. 2d 67 (D. Me. 2005) Judge Hornby determined that an 18 month sentence, which was within Zone D in the guidelines, was appropriate. But considering the defendants background, the court concluded that 18 months of imprisonment would be greater than necessary to meet the goals of sentencing, and for this reason, made use of the Zone C split sentence device to impose a sentence of 9 months in prison and nine months home confinement.

3.     <u>**The Sentencing Range Established by the Sentencing Commission**</u>:

It is Montoni's position and that of the U.S. Attorney that the 2000 version of the Guidelines apply and that the correct guideline range begins with a Base Offense Level of six (6), see, 2F1.1(a). As the loss is greater than $70,000, pursuant to 2F1.1(b)(1)(G), the Base Offense Level would be increased by six (6). Additionally, per 2F1.1(b)(2)(A), as the instant offense involved impacted more than one insurance company, a two (2) level increase is warranted. Likewise, pursuant to 3B1.3, the offense level is increased by 2 levels, bringing the Adjusted Offense Level to sixteen (16).

A three (3) level reduction should be applied pursuant to 3E1.1(a) and (b) for

acceptance of responsibility. Therefore, the total offense level is thirteen (13).

Accordingly, with a Criminal History Category of I, Montoni has a guideline sentence in

Zone D of 12 to 18 months.

We believe that based upon the information contained in the PSR and the within

memorandum, the guideline range does not adequately reflect Montoni's conduct,

personal history, medical condition, mental state, ect. In <u>U.S. v. Ranum</u>, 353 F. Supp. 2d

984 (E.D. Wis. 2005) the Court noted that the remedial majority in <u>Booker</u> directs courts

to consider all the 3553(a) factors, many of which the guidelines either reject or ignore.

The Court reasoned that while courts must seriously consider the guidelines and give

reasons for sentences outside the range, in so doing courts should not follow the old

departure methodology. <u>Id</u> at. 986 – 87.


4.     <u>**The Need To Avoid Unwarranted Disparities:**</u>

The guidelines were intended to reduce unwarranted sentencing disparity across

the country between similarly situated defendants. This Circuit has noted the need to

avoid unwarranted sentencing disparities between federal and state court sentences in

similar cases. <u>U.S. v. Wilkerson</u>, 411 F. 3d 1 (1st Cir. 2005). Given this Court's extensive

experience fashioning sentences in a wide variety of criminal cases, we believe that the

more reasonable approach would be to equate the instant matter to an act that was totally

out of character and one that was profoundly influenced by a very real and deep sense of

depression both mentally and physically. What takes this case from the heartland is that

Montoni has, since his initial interview and subsequent meetings with government

investigators, taken responsibility for his actions and provided whatever assistance the

investigators and the government sought from him. Additionally we believe that this Court should take into consideration the agreed upon sentence of David Tammeran, who, without the benefit of a 5K1.1 or 5K2.13, is facing a sentence of three (3) years probation with six (6) months of home confinement.

5.     **The need to provide restitution to any victims of the offense:**

At bar, Montoni has stepped to the forefront and agreed to pay restitution in an amount directly related to the loss attributable to his actions. A review of the PSR indicates that Global Tech and Lynn Diagnostics submitted a total of approximately 70 fraudulent EMG claims totaling between $70,000 and $120,000 to approximately 16 different automobile companies based upon EMG reports or prescriptions signed by Montoni. While multiple insurance companies paid a total of $32,440.28 to Global Tech and Lynn Diagnostics as a result of those claims, it is important to note that Montoni receive no money from the billings. We believe that a probationary sentence will allow Montoni to maintain gainful employment, thus enabling him to make restitution payments.

Reducing a sentence of imprisonment in matters such as this is well within the realm of sentencing options. In U.S. v. Peterson, 363 F. Supp. 2d 1062 (E.D. Wis. 2005) the defendant was faced with a guideline range of 12 – 18 months. However, the court noted that a sentence of imprisonment would have caused the defendant to lose his job and would have impaired his ability to pay restitution. For this reason, the court imposed a sentence of one day in

prison followed by five years of supervised release, with a condition that the

first half year be in a community correction center and the second half year be

on home confinement, both with work release privileges. The court noted that

the sentence confined the defendant for 12 months – the low end of the

guideline range – while still permitting him to work and pay restitution. This is

a clear example of the application of the 3553(a) factors so as to fashion a

sentence no greater than necessary to meet the goals of sentencing.[2]

## PROPOSED "STATEMENT OF REASONS PURSUANT TO 18 U.S.C. 3553 (c)" FOR SENTENCE BELOW GUIDELINE RANGE

- The perceived monetary loss was more than $70,000. The actual monetary loss attributable to Montoni's actions was $32,440.28.
- Montoni did not receive any money and did not personally benefit financially from his actions.
- Montoni suffered from major depression with psychotic features, and that condition contributed to his conduct relating to the instant offense. See, U.S.S.G. 5K2.13 and as more fully documented in the reports of both Dr. Joss and the PSR.
- Montoni has accepted responsibility for his actions.
- Montoni has no convictions and there are zero criminal history points.
- Montoni has provided substantial assistance in the investigation or prosecution of another person who has committed an offense. As a result, the Court may depart downward from the advisory guidelines. See, U.S.S.G. 5K1.1.
- Montoni's co defendant, David Tammeran has received a sentence of three (3) years

---

[2] It is important to note that the sentencing Court was not presented either a motion under 5K1 or a departure under 5K2.13. If either were presented, the Court could easily have reduced the sentence to probation or a short period of home confinement.

probation with six (6) months of home confinement.

- If Montoni were unable to work, his family, including three children, all at or near college age, would be greatly impacted financially.
- Montoni's response to treatment is good and the prognosis is promising.
- 3553(a) requires that any sentence be no greater than necessary to meet the four purposes of sentencing.
- This Court has the authority to impose a sentence that ranges anywhere from probation to home confinement, community confinement, or any combination thereof.

**<u>CONCLUSION</u>**

For the foregoing reasons, John Montoni respectfully submits that a sentence of twelve months (12) probation is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,
John Montoni,
By his attorney,


*/S/    Neil F. Faigel*
Neil F. Faigel
BBO No. 551688
265 Broadway
Methuen, MA 01844
(978) 681 – 9600

Dated: January 4, 2007



**PSYCHOLOGICAL CONSULTING SERVICES INCORPORATED**

ONE SALEM GREEN
SALEM, MA 01970

978 740-3100
FAX 978-740-5656

WWW.PCSFORENSIC.COM

E-MAIL:
INFO@PCSFORENSIC.COM

ROBERT H. JOSS, PH.D.
FREDERIC KREL, PH.D.
MARK S. SCHAEFER, PH.D.
CHRISTINE SCHNYDER PIERCE, PH.D.

AND ASSOCIATES

## MENTAL STATE AT TIME OF OFFENSE

**REGARDING:**        John Montoni

**DATE OF BIRTH:**        March 21, 1953

**DATE OF REPORT:**        October 17, 2006

**CASE:**        United States vs. Igor Moyseyev, Severin Yelaun, David S. Tamaren and John F. Montoni

## IDENTIFYING INFORMATION

Dr. John Montoni is before the U.S. District Court having pled guilty to one count of conspiracy. Dr. Montoni is a 53-year-old married male who resides with his wife and children in Gloucester, Massachusetts.

Dr. Montoni is represented in these matters by Attorney Neil F. Faigel, who has requested an evaluation of his client's mental state at the time of his offense.

## INFORMED CONSENT FOR EVALUATION

At the outset of my interview with Dr. Montoni on September 21, 2004, I explained to him that I had been requested by his attorney to evaluate him in connection with his federal court case. I explained to Dr. Montoni that information provided to me could be shared with his attorney and that were his attorney to request a report to the Court or testimony in the Court, whatever he told me could become part of the report or testimony. I specifically indicated that he could selectively decline to answer questions and could end the interview at any time.

Based upon my inquiry to Dr. Montoni, he appeared to understand my role as an evaluator for his attorney and the limits of confidentiality attaching to the interviews. His participation in the initial interview appeared to be knowing, willing and voluntary.

At the outset of subsequent interviews with Dr. Montoni, I also gave him the same warning, and he again, on each occasion, was able to communicate an understanding of the purpose of the evaluation and the limitations of confidentiality attaching to the interviews.

SPECIALIZING IN
FORENSIC, MEDIATION
AND CLINICAL SERVICES

1

## SOURCES OF INFORMATION

In addition to interviews with Dr. John Montoni on September 21, 2004, March 7, 2005 and January 20, 2006, I also was able to interview Mary Jane Montoni, his wife, on September 21, 2004. In addition, I reviewed the following records:

1. Lahey Clinic MRI Studies for Dr. Montoni, dated June 7, 2005
2. Laboratory records from Quest Diagnostics, dated June 21, 1999
3. Indictment USA vs. Igor Moyseyev, Severin Yelaun, David S. Tamaren and John F. Montoni
4. Summary of Dr. Montoni's Contacts with Lahey Essex Medical Center from June 29, 1999 to September 25, 2002
5. Radiology Report, Addison Gilbert Hospital, for Dr. Montoni for June 23, 2003
6. Laboratory Corporation of America, Lab Results for April 8, 2003
7. Laboratory Report from Esoterix Inc., dated April 21, 2003
8. Massachusetts General Hospital for treatment in May of 1997
9. Massachusetts General Hospital Radiological Consultation for March 3, 1997
10. Massachusetts General Hospital Psychiatric Evaluation, dated January 29, 1997
11. Massachusetts General Hospital Laboratory Reports for March 16, 1997 and January 15, 1997
12. Massachusetts General Hospital Radiological Consultation, February 21, 1997
13. Massachusetts General Hospital Medical Walk-In Unit, Patient History, February 14, 1997
14. Contacts with Clement L. Trempe, M.D., dated January 19, 1999 with Laboratory Results from January 21, 1999 through August
15. Contact with the New England Medical Center Infectious Disease Clinic, dated February 5, 1997
16. Microbiology Report dated May 5, 1998 with various lab results and progress notes
17. Addison Gilbert Hospital Consultation Report, dated June 23, 2003, including Shields MRI dated July 16, 2003
18. Massachusetts General Hospital Psychiatric Evaluation, dated January 29, 1997

In addition, Dr. Montoni took two objectively scored personality/psychopathology tests, the Millon Clinical Multiaxial Inventory-III (MCMI-III) and the Minnesota Multiphasic Personality Inventory, 2nd Edition (MMPI-II). Both of these scales contain within them scales designed to identify bias in the test-taker. Dr. Montoni completed both of these on September 21, 2004.

## MENTAL STATUS AT TIME OF EVALUATION

A formal mental status evaluation was done on my first interview with Dr. Montoni. At that time, he appeared oriented to person, place and time. He had a good fund of knowledge and could recall three words presented to him verbally, both immediately and

after 10 minutes.  There was no indication of tangential or circumstantial thinking, although I noted that his speech was generally slow and somewhat disorganized.  He was able to demonstrate an ability for abstract thinking by correctly interpreting several common proverbs.  Additionally, he was able to perform a simple arithmetic task (Serial 7's – sequential subtraction of 7, beginning at 100) through 10 subtractions without error.  Dr. Montoni answered all questions placed to him and cooperated with the evaluation.  His affective presentation was consistent with depression.  His responses, although complete, were generally unelaborated.

When asked about the history of auditory or visual hallucination, he indicates that he is not 100% sure, but he thinks he may have had auditory hallucinations, specifically hearing voices calling to him, and that this would happen while he was just sitting still, and it happened "a couple of times—years ago." He indicates that it was a male voice that he did not recognize and that at the time of our evaluation had not happened for quite some time.  One possibility is that this may represent hypnogogic auditory hallucinations (hallucinations occurring at the onset or at the conclusion of sleep) and are not considered of great diagnostic significance.  Dr. Montoni denies any olfactory, gustatory, tactile or visual hallucinations.  When asked whether he thought that people put thoughts in his mind or took thoughts out of his mind, he indicated that he did not think people could do that, although he does have some spiritual beliefs that suggest that it could occur in a spiritual realm.  He denies that others can read his thoughts or that he can read the thoughts of others, or that there are special messages on the television or radio specifically for him.  When asked about depression and given a 0 to 10 scale, (0 equals not depressed, with 10 being the most depressed that he could imagine), he indicated in our first evaluation that he was an 8.  He indicated that that seems to fluctuate.  When asked whether he had suicidal thoughts, he indicates, "You mull it over in your mind when you're not feeling well.  I'd never do that to my kids.  I'm able to put it out of my mind, I'm fairly certain."  When asked how many times he had thought about suicide during the previous month, he indicated approximately six times.  When inquiry was made to his appetite, he indicates that it is okay and that his wife makes him eat in the morning, or he wouldn't.  He indicates that he presently is about 6 ft. tall and weighs about 230 lbs.  When asked about his sleeping habits, he indicates that he has to avoid his mind racing and that sometimes he reads things or takes a walk around the block before he goes to bed or else his mind will race.  He reports that it takes him approximately a half-hour to an hour to get to sleep.  He does admit to occasional racing thoughts and the belief that he has difficulty retaining information.  He indicates some difficulty with memory, and gave an example of forgetting telephone numbers. (However, this did not appear to be out of the ordinary for a person of Dr. Montoni's age and presumed intellectual level e.g. e had no difficulty giving his own telephone number).  Dr. Montoni indicated that he felt anxious.  Again, he was given a 0 to 10 scale and indicated he felt as if he was a 6 on the day that we interviewed.  When asked about the variability of his anxiousness, he indicates that there have been times when he became anxious about driving a car or about becoming sick.  When asked whether he had any fears for his safety, he indicates that "It could be an issue."  He appeared somewhat restless as he sat answering questions form this evaluator.

3

Overall, Dr. Montoni appears to be a man of average to above-average intellectual ability (based upon his level of education and vocabulary) who was experiencing a moderate level of depression at the time we spoke. It appeared to be of sufficient severity to be somewhat distracting to him (he appeared both depressed and confused at points during the interview). There was also evidence of anxiety but not to a level matching his depression.

Subsequent evaluations of Dr. Montoni on May 7, 2005, and again on January 20, 2006, indicate some improvement in his functioning. Particularly by the 2006 interview there was only a mild level of depression and with lessened confusion. He indicated that he had been sleeping much better and that his appetite was good. He also reported that he had been diagnosed with a melanoma which he was following up.

## RELEVANT HISTORY

The information in this section comes from my interviews with Dr. Montoni, my single interview with his wife as well as well as from a review of relevant records received. There did not appear to be discrepancies in the information received or in Dr. Montoni's multiple accounts.

**Family History:** Dr. Montoni is the second of six children born to Richard and Elizabeth (Famico) Montoni. He indicates that his parents separated when he was 10 years of age and that he continued to live with his mother after that period of time. He reports that his father subsequently died of liver cancer in 1995. His mother is still living and is in her 70's. He reports that she did not work outside the home while he was growing up, but later owned a gift shop. He reports he continues to have contact with all of his siblings. When asked about history of substance abuse in the family, he reports that his mother had some problems with both alcohol and pills and that she had tried to kill herself, as had his maternal grandmother. He also indicates his paternal grandmother had Alzheimer's Disease. He reports that his father was a gambler and that he would yell and be physically assaultive towards his wife. When asked whether he abused any of the kids, he indicates that the kids would not challenge him. He reports that his father later remarried. He also reports that after his parents split up, his father did not show up for visits very often.

Dr. Montoni indicates that he was married to his wife, Mary Jane, in 1976, and they have three children, a daughter Kimberly, age 22 a son, Shane, age 19, and a daughter, Kayla, age 17.

At the time I spoke with him in 2004, his daughter Kimberly was a junior at the University of Rhode Island, and his other two children were students at the Gloucester High School. For a period of time the family lived in California but moved back to the Boston area in 1984. Reportedly, Dr. Montoni began and then sold his practice in California.

4

**Educational Background:** Dr. Montoni was educated in high school at St. John's Prep in Danvers, but had to leave for financial reasons and graduated from Salem High School in 1971. He indicates that he worked for ten years as an X-ray technician and went to chiropractic school between 1975 and 1979 at the Cleveland Chiropractic College of Los Angeles.

**Military History:** Dr. Montoni indicates that he did not serve in the military and was never rejected for military service. He indicated he had a high lottery number in the draft and had not been called for service.

**Work History:** Dr. Montoni indicated that he worked as a chiropractor in California and then when their first child was born in 1984, he and his wife decided to move back, and he sold his office in California. He indicated that for a period of time, he had a home office in Swampscott and that he also worked in Brockton and Salem for the equivalent of two days per week from 1996 on. He reports that prior to 1996, he worked full-time in both Swampscott and Chelsea. Most of his adult life has been spent either as an X-ray technician or as a chiropractor. He reported that he had earlier done work in roofing and construction when he was growing up. When asked about his decision to reduce his workload in 1996, he indicated that he was becoming tired and was having difficulty keeping up the pace. I note that in my interview with Mary Jane Montoni, she indicates that at one point a chiropractor from Georgia with whom Dr. Montoni had worked stole his records, leaving the practice, requiring that Dr. Montoni retain a lawyer to get his files back.

Additional details under work history as they relate to the charges will be detailed below.

**Health History:** Dr. Montoni indicates that his health history has been pretty good. He indicates an attack of Reiter's Syndrome in 1981 (a joint inflammation occurring as a result of infections in other parts of the body). He indicates that in 1991 while attempting to sell his property in Swampscott and buy a cottage in Gloucester, in cleaning that cottage, he had an attack of nosebleeds, diarrhea and dizzy spells, which continued off and on for a period of time. He indicates that in 1997 he had lost weight and that he went to the Mass. General Hospital and was diagnosed at that time with depression. He reports that as a result, he was prescribed Zoloft, which made him tired, and he continued that medication for only two to three weeks (typically antidepressants of the type he was taking require 2-4 weeks to have an effect). He indicates that a CT scan indicated chronic sinusitis, and he indicates that he felt like he had a piece of fiberglass or something in his nose. He reports that he subsequently went to an infectious disease person and found that he had a form of Chlamydia infection for which he was prescribed antibiotics. He indicates also an idiopathic tremor. When asked about a history of head injuries, he indicates that he was "knocked out as a kid—I hit my head, but I didn't go to the hospital." He indicates that that was the only loss of consciousness, and he denies any other loss of consciousness or seizure history. More recently he indicates that he has been treated for a melanoma (skin cancer).

**Substance Abuse History:** Dr. Montoni indicates that his present use is one to two glasses of wine one to two times per month. He indicates that as a kid (around age 12), he drank "whenever we could get it." He also indicates that he drank quite a bit in high school, and after high school with his friends, but that his drinking dropped off in college. When asked whether his wife ever complained about his drinking, he indicates that, "She keeps an eye on me." He denies any history of detox or a history of blackouts as an adult, although he does indicate that he passed out one time from drinking as a kid.

With respect to the use of other substances, Dr. Montoni indicates that he experimented with marijuana in high school, and last used it when he was in college. He indicates that he would be smoking and then couldn't remember what happened, so he stopped using. Dr. Montoni denies a history of the use of cocaine, heroin, LSD or the hallucinogens, the abuse of steroids, inhalants, or the abuse of prescription medications.

**Psychiatric History:** Dr. Montoni indicates that in 1997, he went to Mass. General Hospital, where he was diagnosed with a major depression with psychotic features. Evaluation of Dr. Ruta Nonacs indicates a presentation with multiple somatic complaints as well as depression and several prominent neuro-vegetative symptoms. Dr. Montoni was at that time started on Zoloft, 50 mgs per day and referred for psychotherapy. He noted for Dr. Nonacs's evaluation, the onset of depression from approximately 1990 to 1991, with multiple physical complaints, including dizziness, neck pain and rash, and indicated this had been a difficult time for him as his father had been diagnosed with bladder cancer and had subsequently suffered a heart attack. Dr. Montoni reported a gradual physical decline over the past six or seven years with concurrent depression (1997 evaluation). He reported in that same evaluation that the symptoms of depression have become quite severe over the past year and has noted a deterioration in his ability to work. He presented at Mass. General Hospital at that time complaining of diminished energy, poor concentration, difficulty sleeping. At the time he was seen in January of 1997 by Dr. Nonac, he was convinced that he had a life-threatening illness with frequent ruminations of his own death and becoming overwhelmed with the thoughts of leaving his children behind. Simultaneously he was noted to be anxious and easily startled, and finding it more difficult to be around people, he became progressively more socially isolated, often reluctant to answer the phone and to open his mail. As a result, he cut back his hours at work to 14 per week. He reported a previous episode of depression 20 years prior to 1997, when his grandfather died, but he reports no prior psychiatric hospitalizations and no history of suicide attempts or gestures. The report of Dr. Nonacs identified a family history notable for depression in his sister, mother and grandmother, with both his mother and grandmother having made several suicide attempts. At the time of his evaluation in 1997, he was described as "...disheveled and exhibiting prominent psychomotor retardation. His speech is soft and retarded in rate. His mood is described as 'depressed.' His affect is flat and minimally reactive. His thought processes are in general goal-directed, but he tends to perseverate regarding issues of his own health. He reports somatic complaints of delusional proportions. He also has occasional auditory hallucinations; a voice calling his name. He denies having visual, olfactory, or gustatory hallucinations. He denies symptoms of complex partial seizure activity. He denies suicidal or homicidal ideation. He reports decreased sleep with difficulty falling asleep.

6

He reports anhedonia, diminished energy, poor concentration, and feelings of hopelessness.

At present, Dr. Montoni sees Sandra Ronan-Dahl, a licensed social worker in Gloucester, for treatment for his depression. He indicates that going to see her "helps me clear my head...I always feel better after a visit."

Dr. Montoni, in a description of his own depression, indicates that in 1994, his father was diagnosed with terminal liver cancer and "it got in my head. It was crushing me constantly." He indicates that by the mid-90s, "I knew I was on shaky ground, losing confidence, working on my own." He then reports in 1997 he went to Mass. General Hospital for treatment of depression.

**Religious History:** Dr. Montoni identifies himself as a Protestant who attends St. Ann's parish in Gloucester. He reports, "My wife likes to go."


## SUMMARY OF TESTING RESULTS

Dr. Montoni took two psychological tests.

**MCMI-III Interpretations:** The computer generated results of the Millon Clinical Multiaxial Inventory-III (MCMI-III) indicate the following:

> The MCMI-III scores of this man suggest an intense conflict between his dependency upon most people with whom he has a personal relationship and his feelings of guilt and self-condemnation. Although he would like to lean on others, he has learned to anticipate pain and disillusionment. Despondency may overlay a marked deflated sense of self-esteem, and his expectation of repeated personal failures and humiliation may constrain his efforts to assert himself by becoming more autonomous or independent. Because others have either undone or deprecated his attempts at self-assertion, he may have become increasingly pessimistic about the future, brooding over past events and feeling sorry for himself. However, these restrictions and dispiriting adaptations stir deep resentments within him. As a consequence, he may act in a petulant manner, occasionally attacking others for their lack of support. The accommodations that he seeks with others are seriously jeopardized by these infrequent displays of discontent and anger, however. To restrain his resentments and to protect himself against further loss of support, he may withdraw into fantasy solutions, remaining in his characteristically depressed and somber state.

> The gloomy moodiness of this man may only evoke critical, if not humiliating reactions from others, and such reactions reinforce his depressive tendency and self-protective withdrawal. Every avenue of potential gratification may be fraught with conflict. He hesitates to stand on his own because of feelings of pessimism and self-doubt. On the other hand, he fears he cannot depend on others. Disposed

to anticipate disillusionment, he may behave in a helpless and inadequate manner, and thereby incur the expected rejection and disappointment.

His depressive tone, thoughts of suicide, and feelings of self-reproach may be omnipresent. Unable to gain the skills for overcoming his deficits or for attracting the support of others, and finding that his fantasies provide little respite from his low self-esteem, he may turn against himself, expressing feelings of unworthiness and uselessness. Feeling misunderstood, unappreciated, and demeaned by others, he builds his defenses against anticipated ridicule and contempt...

This man is likely to see himself as possessing few of the qualities he admires in others. This awareness intrudes on his thoughts and interferes with his behavior, openly upsetting his capacity to cope with daily life. When stresses are minimal, he may withdraw from his dream world, denying his sense of failure and attempting for the moment to convey an air of well-being. These efforts give way under the slightest pressure, thereby reactivating his dismay, his brooding about the past, his preoccupation with self-pity, stirring up feelings of being misunderstood and mistreated, and leaving him to retreat against his dispirited state.

The following is noted about active clinical syndromes from the MCMI-III:

Evidence indicates the presence of a prominent anxiety disorder in this man. Widely generalized symptoms are consistent with his overall personality make-up: pervasive social disquiet, behavioral edginess, apprehensiveness over small matters, and worrisome self-doubts, the most frequent of which may relate to feelings of masculine inadequacy. Specific psychosomatic signs may be present, in addition to the more general anxious state. These signs include fatigue, insomnia, headaches and an inability to concentrate. Especially sensitive to approval, yet lacking the confidence to respond with equanimity, he may be experiencing more discomfort than usual, particularly if his resentment has been expressed against someone with whom he would rather have maintained peace or a safe distance.

There is evidence of a chronic pattern of moderate depression that is characterological in this socially awkward and introverted man. He exhibits a persistent level of downheartedness that is consistent with a dysthymic syndrome. Preoccupied with matters of personal adequacy, plagued with self-doubt, and feeling useless much of the time, he may be bothered especially by the view that he is both socially unattractive and physically inferior. Periodically sad, empty, and lonely, he is likely to have deep, frustrated yearnings for social acceptance. Because of his defensive efforts to flatten his emotions, as well as hide feelings of despair, his depressive pathology may be contained sufficiently to fade into a typically bland appearance. Nevertheless, self-deprecatory thoughts and attitudes of futility can be readily elicited by skillful probing.

**MMPI-II Interpretations:** The MMPI-II was administered and Dr. Montoni's responses were considered to be given in a frank and open manner, producing a valid MMPI-II profile.

The following symptomatic patterns developed from the MMPI:

> Client appears to be gullible, but is also extremely angry and suspicious that others are taking advantage of him. He is also overly sensitive to criticism. Aloof, detached, and rigidly moralistic, he reacts to threats by projecting and rationalizing. He takes little responsibility for his problems, instead blaming others and harboring grudges.

> Such clients may be overly paranoid with delusions and clear ideas of reference. In addition, the following description is suggested by the content of the client's item responses. He has difficulty managing routine affairs and the items he endorses suggest poor memory, concentration problems and an inability to make decisions. He appears to be immobilized and withdrawn and has no energy for life.

> According to his response content, there is a strong possibility he has seriously contemplated suicide. The client's recent thinking is likely to be characterized by obsessiveness and indecision. He is rather high-strung and believes that he feels things more or more intensely, than others do. He feels quite lonely and misunderstood at times.

## DR. MONTONI'S ACCOUNT OF HIS RELATIONSHIP WITH HIS CO-DEFENDANTS

I discussed with Dr. Montoni his relationship with the co-defendants on several different occasions and got consistent responses. Dr. Montoni indicates that, beginning at about 1994, when his father was diagnosed with terminal cancer, he began to become depressed. By the mid-90's, he indicates, "I knew I was on shaky ground. Losing confidence, working on my own." He indicates that in 1997-1998 he knew of a woman who owned a building in Chelsea who indicated they needed someone to help with x-rays. He indicated that he felt that working on a part-time basis would give him a support system. He indicates that the practice had patients who came in and needed both testing and physical therapy. He reports that the majority were personal injuries from automobile accidents. He reports that he signed to get the needed x-ray equipment. He indicates that because of a lost lease the practice moved to a place in Lynn on Union Street and the office in Chelsea was closed. He indicates that he was involved in diagnostic testing and that another person was involved in doing muscular-skeletal ultrasounds, x-rays and EMGs. He indicates that they (co-defendants Igor Moyseyev and Severin Yelaun) "asked me to sign off on the EMGs."

When Dr. Montoni was asked whether he ever expressed any of his discomfort to his wife, he indicates that he did. He indicates that he was signing EMG'. Dr. Montoni indicates that he began the practice in Chelsea prior to going to Mass General Hospital, but then started the practice with the co-defendants (Moyseyev and Yelaun) in Chelsea at the suggestion of the woman who owned the building where they were leasing the space. He indicates that she had told the co-defendants (Moyseyev and Yelaun) that he had an X-ray background, and they asked him if he would set up an X-ray business in their clinic. He indicates that at that time he thought the co-defendant Yelaun was a physical therapist, because he thought you had to be a physical therapist to go into the physical therapy business. He indicates that a few months after he had been there, he found out that he really was not a physical therapist. When asked how he discovered that, he indicates that he was too ignorant about physical therapy cases. He indicates that the two Russian co-defendants wanted him to sign a lease on the equipment which he thought would be about $11,000. He indicates that they lost the lease on the office in Chelsea in late 1998, but he was still seeing his own patients at his own facility. He indicates that at the beginning most of the patients were his, but that as time went on, most of the patients became theirs. Eventually he notes that Yelaun moved the equipment to Union Street in Lynn and he (Montoni) saw patients at Lynn and also in Chelsea. He indicates that some time around the end of 1998 that Yelaun asked him to write a script for a patient, but he was not sure whether he was seeing him or hadn't seen him.

When Dr. Montoni was asked at what point he understood that something was not right, he indicated that in 1999 Moyseyev and Yelaun came over to his house with a box of completed EMGs for which they wanted prescriptions. He indicated that they looked like regular read-outs with patients' names, histories, etc. Further, Dr. Montoni indicated that the co-defendants told him to sign EMG tests that, as a chiropractor, he was not qualified to perform.

When Mr. Montoni was asked why he didn't attempt to extricate himself at that point, he indicated that he couldn't afford to pay off the X-ray equipment, which would have been about $7,000 to $8,000. He thought if he opted to get out that he would go bankrupt. When asked whether he felt physically threatened, he indicates that Yelaun always worried him. He indicates that on one occasion an outpatient had complained that he didn't like the treatment he was receiving, and he (Dr. Montoni) told him he could go wherever he wanted to get treatment, and he indicates that Yelaun started yelling at him (Montoni). Dr. Montoni indicated that he didn't want to confront him, and he was worried about protecting his family. When asked whether he was worried about protecting his family financially or physically, he indicated, "I didn't know what they would do." When I asked him whether he was aware that they had threatened to hurt or hurt anyone else, he indicates that their secretary had been complaining that she was being harassed and Yelaun asked whether she wanted them to take care of the person who was harassing her.

When asked if he ever thought about going to the authorities, he indicates that he thought that it would come out in the wash, and if they didn't change their ways, it would take its own course. When asked what he meant by that, he indicates that the fraud would come to light with the internal investigations that the insurance companies were undertaking.

**OBSERVATIONS ABOUT DR. MONTONI'S MENTAL STATUS AT THE TIME OF THE OFFENSES**

It is noteworthy that the offenses are alleged to have occurred during the period of 1998 to 2002. It is also noteworthy that Dr. Montoni had a pre-existing depression, which was diagnosed at Mass. General Hospital as a Major Depression with Psychotic Features in the beginning of 1997. He continues to show evidence of depression, although psychotic features are less evident. Despite that, his test scores indicate that he does evidence some degree of paranoia and loosened thoughts. Additionally, his test scores indicate that at present he has high levels of depression with somatic concerns.

My interview with his wife indicated that Dr. Montoni is a person who is not able to handle conflict. When I asked for an example of that, she indicated that as their kids were growing up, if she yelled at them about picking up things, that Dr. Montoni would go in and help them pick up rather than confront them. She also indicated that in her discussion with Dr. Montoni about Severin Yelaun, he had described him as sometimes nice and sometimes irrational. She indicates that she continued to be afraid that they would do something to her husband because she had heard a rumor that Severin Yelaun had gone to a lawyer's office and was throwing things. She summarized her observations about Dr. Montoni as a person who did not like conflict and would do almost anything he could to avoid it.

**SUMMARY AND RECOMMENDATIONS**

1. Dr. Montoni is before the U.S. District Court and has entered a guilty plea to conspiracy. Dr. Montoni is a 53-year-old married male who resides with his wife and children in Gloucester, Massachusetts. According to the indictment, Dr. Montoni saw patients in various physical therapy and rehabilitation clinics in the metro Boston area, including Lynn and Chelsea, Massachusetts and referred his patients as well as individuals who were not seen or treated by him for diagnostic tests through various companies, including Global Tech and Lynn Diagnostics for EMG and NCV testing. Dr. Montoni's alleged role in the scheme set forth was to write prescriptions for and sign other forms requesting EMG and/or NCV testing without regard to medical necessity. In addition, Dr. Montoni signed reports that purported to be the EMG and NCV tests, while having no training or knowledge in performing such testing, having never done or reviewed any such tests, and, as a chiropractor and not a medical doctor, not being authorized to do EMG testing. The vast majority of Dr. Montoni's patients claimed injuries from motor vehicle accidents.

2. Dr. Montoni is represented in these matters by Attorney Neil F. Faigel, who has requested an evaluation of his client's mental state at the time of his offense.

3. Dr. Montoni had a longstanding depression with concurrent character patterns of dependence prior to the events that resulted in the current federal indictment. It is evident in the fact that his practice was declining and he had no energy and was unable to any longer work a full week. Records from Mass. General Hospital indicate a diagnosis of Depression with Psychotic Features in early (January) 1997. This predates the events alleged in the federal indictment. It is entirely consistent with Dr. Montoni's presentation that he was unable to confront his co-defendants in this matter and extricate himself from the situation even after he discovered what was happening and understood it to be wrong. He notes that he felt intimidated by the two major co-defendants (Moyseyev and Yelaun). He saw himself as financially entangled and feared both financial disaster and physical harm to himself and/or to his family were he to try to extricate himself.

4. Based upon the information available to me, it is my opinion that Dr. Montoni's ability to do other than he did was diminished by his depression and character traits of an unwillingness to confront and handle conflict. He did have the prerequisite mental disease (major depression with psychotic features) at the time of the alleged offenses, and was, to an extent, impaired in acting on his understanding because of his depression. His character structure of dependence does not easily allow for confrontation and his subjective fear of both financial and physical harm were he to try to extricate himself was, to him, very real.

Respectfully submitted,

*Robert H. Joss Ph.D.*

_____

Robert H. Joss, Ph.D.
Licensed Psychologist

*Dr. Joss is recognized by the Massachusetts Department of Mental Health as a designated forensic psychologist and forensic mental health supervisor.*